No. 19,338.

CARRIE M. ABBOTT, as Administratrix, etc., *Appellee,*
v. THE BOARD OF COUNTY COMMISSIONERS OF THE
COUNTY OF WYANDOTTE, *Appellant.*

### SYLLABUS BY THE COURT.

BRIDGES—*Automobile Accident—Evidence—Findings.* The evidence examined and held that the special findings and general verdict of the jury are sustained with respect to the following matters:

1. APPROACH TO DEFECTIVE BRIDGE—*What Constitutes.* A number of feet of filling was made between the abutment of a bridge and the bank of the stream spanned by the bridge. Such filling was necessary to connect the bridge with the highway and make it accessible from the highway, and constituted an approach forming a part of the bridge.

2. BRIDGE—*Defective for Want of Guard Rail.* The location and construction of the bridge were such that it was defective for want of a guard rail at its northeast corner to protect travelers on the highway from missing the entrance to the bridge and plunging over the bank of the stream.

3. *Notice to Chairman of Board of County Commissioners.* The chairman of the board of county commissioners had notice of such defect derived from knowledge of the conditions for more than five days before the occurrence of the casualty forming the subject of the action.

4. *Automobile Driver Not Guilty of Negligence.* An automobile driver who was driving his car in the nighttime at the rate of about twenty-five miles per hour, and who missed the bridge and was precipitated over the bank of the stream and killed, was not guilty of contributory negligence.

Appeal from Wyandotte district court, division No. 3; HUGH J. SMITH, judge. Opinion filed March 6, 1915. Affirmed.

*L. W. Keplinger,* and *C. W. Trickett,* both of Kansas City, for the appellant.

*C. Angevine, J. K. Cubbison, William G. Holt, L. F. Bird,* and *H. G. Pope,* all of Kansas City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages result-ing from the death of the driver of an automobile, oc-casioned by a defective bridge. The plaintiff recovered and the defendant appeals.

The bridge spans Mission creek between Edwards-ville and Bonner Springs. The bridge is forty feet long and is in line with the roadway to the west but not to the east. The roadway leading to the bridge from the east is generally forty feet wide, sixteen feet of which is macadamized. Within twenty feet of the bridge the roadway narrows down to the width of the bridge, which is fourteen feet. The traveled portion of the road includes not only the part macadamized but level ground on each side of the macadam, and when snow is on the ground the surfaced and unsurfaced portions are indistinguishable. An automobile driven westward toward the bridge along the north side of the road would, if it continued in a straight line, miss the bridge.

The deceased conducted an auto-livery business at Bonner Springs. About nine o'clock on the evening of January 5, 1913, he received a call from Edwardsville to go to that place with an automobile and from there take two young men and two young women to Bonner Springs to catch a train leaving Bonner Springs at nine forty-five. The distance between the two towns is about three miles. As the deceased with his pas-sengers approached the bridge from the east on his return to Bonner Springs he was driving at the rate of about twenty-five miles per hour. There was no moon, the wind was blowing, it was snowing a little, and the ground was covered with snow. He drove in a straight line along the north side of the road, missed the bridge except that the left rear wheel of the automobile struck the north girder of the bridge, and went over the embankment to his death.

The petition charged negligence in failing to pro-

vide a suitable and sufficient approach to the bridge and guard rails at the ends and sides to act as a warning to travelers nearing the bridge, particularly in the nighttime, indicate the location of the bridge, and enable travelers to see it so that they would not miss it and be precipitated into the creek. The court instructed the jury that an approach is something connecting the bridge proper with the highway making the bridge accessible from the highway, and so submitted the cause that the existence of an approach in this sense was material to the plaintiff's cause of action. The defendant says the evidence shows that the moment a vehicle going east leaves the bridge it is upon natural ground which had been the roadbed for years before the bridge was erected. The jury returned the following findings of fact on this subject:

"Q. 1. Was there any filling made at any time at the east end · of the bridge, except the back filling around the abutment? Answer. Yes.

"Q. 3. In about 1904 or 1905, when the bridge was moved to the east and stone abutments were put under it, was any approach built, or work done on the road immediately east of the bridge, except back-filling around the abutment? Answer. Yes.

"Q. 5. Did the county build or construct any approach at the east end of this bridge? Answer. Yes."

There was evidence sustaining the defendant's view, but a number of witnesses who claimed to be familiar with the facts gave testimony supporting the findings of the jury.

Some confusion results from the use of the word "fill" by different witnesses. It fairly appears that when the bridge was reconstructed the surface of the ground east of the bridge was higher than the bridge and was graded down to the same level as the bridge, the earth removed being used to make a fill of considerable length at the west end of the bridge. There was clear evidence, however, that when the east abutment was constructed it was set some distance, the estimates

vary from a few feet to several feet, from the east bank of the stream and the space between the abutment and the bank was filled in. This filling constituted an approach.

In the defendant's reply brief it is said:

"The abutment was 8 or 10 feet wide at the bottom. The excavation therefor was necessarily some wider so as to leave room for placing the foundation stones. The abutment at the top was two feet wide. Consequently when the abutment was complete there had to be some filling in against the land side of the abutment."

Accepting this statement as true, the filling constituted an approach.

In this case the existence of a very small approach is sufficient to satisfy the requirement of the instruction because the petition was interpreted too rigidly against the plaintiff. It is not necessary to quote the allegations of the petition here, but they are open to the interpretation that guard rails as appurtenances to the bridge itself were necessary to make the bridge a proper structure, and whether or not an artificial approach existed this bridge was defective for want of a wing guard at its northeast corner. The purpose of the bridge was to carry traffic brought up to it by the highway over the stream. It was so located and constructed, however, with respect to the stream and to the highway, that travelers using the highway with due care might miss the entrance and plunge over a dangerous declivity. Therefore the bridge itself was incomplete and defective in construction.

It is said there is no evidence which warranted the jury in finding that the chairman of the board of county commissioners had notice of the defect in the bridge for at least five days before the casualty, as the statute imposing liability on the county requires. The court instructed the jury as follows:

"If the jury believes from a preponderance of the evidence that James Kilmer was the Chairman of the

Board of County Commissioners of Wyandotte County, Kansas, on January 5th, 1913, and at the time of the death of Abbott, and while acting as the Chairman of said Board frequently visited said bridge prior to the death of Abbott, and passed over the bridge in controversy and saw the condition surrounding said approach (if you find there was constructed at the east end of said bridge an approach, as hereinbefore stated), and knew that there were no guard rails on the north side of the east approach of said bridge, and had personal knowledge of the conditions at said point, then you may find that the defendant had notice of the condition of said bridge. And if you further find from the evidence that the east approach (if you believe and find there was such an approach) was unsafe and dangerous to travelers by reason of the lack or failure to erect guard rails on the north side of said approach, then you may find that the defendant had notice that said bridge and its east approach was in a defective and unsafe condition."

It is not claimed that this instruction misstates the law, but that the question of notice should not have been submitted to the jury at all.

The chairman of the board of county commissioners denied that he ever saw or knew of any dangerous condition at or near the bridge, and said his attention had never been called to conditions at the right of the east end of the bridge; he had never noticed or had knowledge of the conditions there, and in passing over the bridge he had never noticed the "jump off" or condition there. Notwithstanding these assertions the jury appear to have been satisfied he did know and had long known the facts.

The testimony of the chairman of the board of county commissioners shows these facts: He knew the road to Bonner Springs; he knew the location of the bridge; he knew a road called the Trent road, which came into the highway almost at the east approach of the bridge; he had known the bridge ever since it was constructed, or at least for twelve years; he had passed over the bridge frequently while chairman of the board and with

other members of the board; he had looked at the bridge when he went over it; he knew the length of the bridge and the character of the east abutment, and he answered as to the height of the bridge above the water level; he disclosed intimate knowledge of the construction of the bridge proper with respect to guards and hub-rails; and he knew from looking at a photograph handed him at the trial, showing the bridge without guard rails on the east approach, that no change had been made in the bridge from what the photograph disclosed. These facts and admissions placed the witness in the attitude of knowing substantially everything about the bridge except its obvious defect. If he admitted knowledge of the absence of barriers, he admitted knowledge of the defect. When pressed concerning such knowledge he answered, "I don't remember of any" guard rails, and "I don't recollect of any railing." The subject of railings was, however, brought quite forcefully to the attention of the witness while he was a member of the board and within some months of the time he became chairman. An accident occurred on the west approach to the bridge, due to the absence of a railing, which resulted in injury to a woman. A claim for damages was presented to the board and afterwards suit was brought upon it. The board settled this claim after an inspection of the place where the accident occurred. To reach the west approach the commissioners went over the east approach, which had no railing, and across the bridge. The examination of the same witness reads:

"Q. You remember the case? A. I remember the case, yes.

"Q. A man named Smith, and his wife? A. Yes.

"Q. You remember you went out there with the other members of the Board before that case was settled, to look it over? A. Yes, sir."

Yet, when asked if there were guard rails at the west end of the bridge his answer was, "I don't remember of any."

The court regards the evidence as ample to require the giving of the instruction quoted and to sustain the verdict so far as it includes a finding of notice.

It is argued that the deceased was guilty of contributory negligence as a matter of law, and special stress is placed upon the rate of speed at which the deceased was driving.

In answer to the question "At about what rate of speed was the auto being driven," the jury answered, "Twenty-five miles per hour." The testimony of survivors of the accident placed the rate of speed considerably lower, and both the plaintiff and the defendant regard the finding as not responsive to the evidence. The answer of the jury was not intended to be definite. The testimony of the witnesses merely estimated the rate of speed. Regarding the estimate as depressed by the witnesses, the jury merely raised it somewhat. Their answer responded to the indefinite question "At about what rate" and means simply, nearly or approximately twenty-five miles per hour.

The jury returned the following special findings of fact:

"About how far did the headlights of the car light the road, in front of the automobile? Answer. 50 feet.

"Within what distance could the car be stopped going at the speed you find it was traveling? Answer. 50 feet."

It is argued that the plaintiff should not have been driving so fast that the entire distance he could see was required for stopping the automobile. The deceased had no occasion to anticipate stopping. He was on the right-hand side of a broad highway and could see far enough to turn aside if confronted by visible objects. If a barrier had been extended a few feet from the corner of the bridge he could have made the turn necessary to put him in line with the bridge and the road beyond without reducing speed at all.

Regarding the rate of speed at which the deceased was driving as something like twenty-five miles per

hour, it is not conclusive upon the question of his prudence, and the jury returned the following special finding:

"Was Mr. Abbott driving the automobile at too high rate of speed on the night in question, considering all the facts and circumstances surrounding the occasion? Answer. No."

It is not necessary to recite all the facts and circumstances here referred to. They included the essential elements of safe automobile driving generally, the character, ability, and skill of the deceased as an automobile driver, the character of the machine and its ability to perform, its state of repair and its equipment with respect to lights, brakes, steering gear, and other things, the mission which the deceased was executing, time and weather conditions, the character and condition of the road, the location of the bridge, its character and its surroundings, the familiarity of the deceased with the road and the bridge, and other matters the relation and effect of which made the question of contributory negligence one for the jury to determine.

The judgment of the district court is affirmed.