# Louisville & N. R. Co. et al. v. Hadler's Administrator, and four other cases.

(Decided Feb. 16, 1937.)

ODIS W. BERTELSMAN and GALVIN & TRACY for appellants.

ARTHUR C. HALL and CLARKE E. KEENEY for appellees.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Reversing.

The right of way and tracks of the Chesapeake & Ohio Railway Company, hereinafter called the C. & O., and the Louisville & Nashville Railroad Company, hereinafter called the L. & N., parallel each other where

they cross Central avenue between Twelfth and Thirteenth streets in the city of Newport. The elevation at the intersection of Central avenue with Thirteenth street is 32 feet higher than the tracks of the C. & O., and something over 24 feet higher than the tracks of the L. & N., and is over 35 feet higher than the intersection of Central avenue with Twelfth street. Some time during or shortly after the year 1889, these railroad companies under a contract and agreement with the city constructed a bridge over their tracks, beginning at a point near Thirteenth street and running above and with the center line of Central avenue to a point near Twelfth street where it made a sharp curve to the right and ran near or with the south side of Twelfth street to Columbia street.

Between 4 and 4:30 o'clock on Sunday morning, June 12, 1932, a Cadillac sedan owned and driven by Harry F. Hadler, in which Everett King Thomason, Malcolm T. King, Richard C. Thomas, and Frank V. Scott were also riding, turned to the right from Thirteenth street and started to cross the bridge, and either because of the failure to observe the curve in the bridge or because of inability to negotiate it, the automobile went ahead across the sidewalk, crashed through the railing, and fell into Central avenue in or near the intersection with Twelfth street. All of the occupants of the automobile were killed except Thomas, who sustained severe injuries.

In actions based on alleged negligence, as hereinafter more particularly set out, Thomas and the administrators of his companions have recovered judgments against the C. & O. and the L. & N., and the companies are appealing. The five cases were heard together below, and as questions presented in each are identical, they will be treated in one opinion.

A number of points, some of which are subdivided, are set forth and discussed in brief for appellants. They may all properly be disposed of in connection with the discussion of a few of the grounds urged for reversal which, in substance, are: (1) That the court erred in overruling demurrers to the petitions; (2) error in overruling motion of appellants for peremptory instructions at the close of the evidence for appellees and at the close of all the evidence; (3) that the instructions given were erroneous; (4) that the

court erred in refusing to give an instruction on contributory negligence and in refusing to give other instructions offered by appellants. These questions call for at least a brief recital of the facts as disclosed by the record.

All the victims of the accident resided in Ohio, and according to the evidence of Thomas, he and Thomason met by chance in front of a restaurant in Elmwood, Ohio, which is a few miles from Cincinnati. While they were talking, Hadler came from the restaurant and Thomason asked him if he wanted to go to a party over the river about 4 or 5 miles beyond Fort Thomas. Hadler indicated a willingness to go, so the three men got into his automobile and after going a few blocks met and were joined by Scott, and in passing through St. Bernard, King joined the party. They stopped at a cafe in Cincinnati, where they remained until shortly after 2 o'clock, and then resumed their journey, passing through Newport, Fort Thomas, and on out the Alexandria pike 4 or 5 miles. It seems that Thomason did not know definitely where the party was to be, and failing to locate the place, they returned by way of Alexandria pike, and upon reaching the railroad crossing at Twelfth street in Newport found it blocked by a train. After waiting there for a few minutes, at the suggestion of Thomason, who stated that he knew a way around, they turned back to Thirteenth street and followed it to Central avenue, where they turned to the right and proceeded on to the overhead bridge. According to his evidence the lights on the automobile were good and afforded about the ordinary visibility. He testified that Hadler changed gears on entering Central avenue and "could not have gone over 8 or 10 miles an hour from there"; that it was drizzling rain and was dark and misty; that he was looking ahead but did not discover the curve in the bridge or the railing at the outside of the walkway until they were right up to it, and he heard the squeak of the brakes when applied by the driver. He was permitted to state without objection that Hadler did not see the guard rail until he was right onto it. His evidence indicates that he assumed this from the fact that the driver suddenly applied the brakes at that time. He remembered nothing further in connection with the accident.

The bridge from the end near Thirteenth street to

a point beyond the railroad tracks something over 100 feet from Twelfth street is of steel and concrete, except the floor of the driveway is of wooden blocks laid in concrete. Concrete walks 9 inches above the driveway form a curb of that height on each side thereof. Beyond the point indicated the oaken floors of the driveway and walks are supported by wooden beams and trestlework. The walkways are about 5 inches above the driveway, with timbers about 5 inches in thickness forming a curb of that height on each side of the driveway. At the outer edge of these walks are 5x5 posts 3 feet and 8 inches in height which have been nailed to the bridge, and a fence or guard rail has been made by a 2x8 board at the top of the posts and two 1x6 boards nailed on between that and the bottom. Every other post is braced by a small timber reaching from its top to a beam that extends beyond the edge of the bridge. From the Thirteenth street end of the bridge to where it joins the wooden structure it rises at a uniform grade of 1 per cent. From there on it declines with a grade of about 1 per cent. at the beginning, which increases to about 6½ per cent. where it reaches the east side of Central avenue. There is a light pole near the northeast corner of Central avenue and Twelfth street which is 44 feet high, and suspended from an arm on this post is an electric light about 10 feet above the floor of the bridge at that point. According to a plat filed as Exhibit X, this light would be a few feet east of the extension of a line running with the east edge of the bridge as it follows the center line of Central avenue.

A number of witnesses, including the county engineer of Campbell county and police officers of the city and men residing in the vicinity of the bridge and who had often had occasion to cross it, testified that in crossing it in the nighttime from Thirteenth street, the electric light apparently was at the right side of the bridge, and the lights on Central avenue as they appeared ahead created an illusion and gave the impression, especially to one not acquainted with the situation, that the bridge continued on down Cenral avenue. A number of these witnesses testified that in ascending the grade from Thirteenth street, the lights of an automobile would be thrown above the top of the fence or railing around the bridge and would shine on a reflector

which has been placed on the bridge since the accident occurred and which appears from the pictures filed in evidence to be 3 or 4 feet above the top of the railing. They further stated that the lights of an automobile would not shine upon the fence or guard rail until after the automobile has passed onto the wooden portion of the bridge, and then because of the color of the boards which blend with the background and the confusion of shadows made by the light pole, one would not discover the railing until practically on it. Some of the witnesses testified that the illusion created and the difficulty of seeing the railing in the nighttime was more pronounced when it was misty or rainy. One witness testified that he avoided the bridge when it was dark and rainy because of the conditions described and the slippery and dangerous condition of the floor when wet.

Witnesses introduced by appellants testified that motorists could see the guard rail in approaching it in the nighttime, and one witness who made observations in the night testified that the lights of his automobile shone on the entire fence where he was 168 feet from it. He stated, however, that this was on a clear night. There were no eyewitnesses to the accident, but a number of people heard the crash and went to the scene, and one young man who lives nearby on Twelfth street testified that he was preparing to or had just retired and heard the automobile as it crossed the bridge; that it roared like an airplane immediately before the crash, and from his familiarity with the sounds of automobiles he judged it was going very fast. There is also evidence to indicate that the automobile hurtled through the air and landed some distance from the bridge, although there is a confusion and apparent conflict as to where it landed with reference to the bridge. Without further recitation it may be said that there is a sharp conflict in evidence on all these questions.

In each of the petitions it is alleged, and not denied, that appellants in consideration of certain grants and privileges, and in consideration of release of obligations with reference to the erection of other bridges, entered into a contract with the city of Newport to erect the bridge in question according to the plan above indicated and further plans and specifications shown on maps and plats in evidence; and covenanted and obligated themselves to the city to maintain and keep the

bridge in good order and safe condition. It is further alleged that because of the conditions above detailed, the bridge was dangerous and unsafe for public travel, and these conditions were known, or by the exercise of ordinary care and diligence could have been known, by appellants. The negligence alleged and relied on is in substance that appellants failed to maintain sufficient lights to give warning of the sharp and dangerous curve, and not having sufficient guard rails to protect vehicles from leaving the roadway and running off the bridge.

Demurrers to the petitions were overruled. Answer to each petition consisted of a general denial of the dangerous conditions alleged and all allegations with respect to negligence and in a second paragraph affirmatively pleaded contributory negligence. The issues were completed by a reply traversing the affirmative allegations of the answer.

The most serious problem we are called upon to consider is presented by the first ground as above set out. In addition to what we have recited, the petition sets out in substance the terms of the agreement or contract under which the bridge was constructed, the manner in which it was constructed, and the dangerous conditions complained of, and alleges that appellants failed to exercise ordinary care to keep the bridge in good order and safe condition, and were also negligent as hereinabove indicated in not having sufficient lights to warn travelers of the sharp curve in the bridge and in not having a guard rail sufficient to prevent automobiles from going over the bridge and into the street below. .

No cases directly in point have been cited by counsel, nor do we find any; so we will necessarily have to be controlled by general principles and analogous cases. As we view the matter it is necessary to first determine whether the city would have been liable in the circumstances, if it had constructed and maintained the bridge; and if so, then whether by law or under the terms of the contract, appellants assumed the liability and obligation which otherwise would have been imposed upon the city.

The duties of municipalities with respect to bridges which form a part of streets are the same as they are

in respect to the streets, and the same is true as to persons using the streets or bridges forming a part thereof. It is a general principle running through all authorities that municipalities must use ordinary care to keep their streets in a reasonably safe condition for public travel, and that persons using streets or other highways must exercise ordinary care for their own safety; and "ordinary care" means the same whether applied to times of the ox cart and horse-drawn vehicle with sparsely settled communities or to this highly mechanized age with densely populated metropolitan centers and its powerful and swift motor vehicles. Conditions have changed and traffic problems have become more complex, but ordinary care now means and has at all times, under our system of jurisprudence, meant the care that would be exercised by an ordinarily prudent man under similar circumstances. It is negligence for a city to create or to permit a condition in its streets that is dangerous to the lives or safety of those using them, without adopting such means as are reasonably sufficient to give warning of the dangerous conditions. This has been so recognized and held by this court in numerous cases, some of which are Gatewood v. Frankfort, 170 Ky. 292, 185 S. W. 847; City of Louisville v. Lenehan, 149 Ky. 537, 149 S. W. 932, Ann. Cas. 1914B, 164; Grider v. Jefferson Realty Co. (Ky.) 116 S. W. 691; City of Georgetown v. Groff, 136 Ky. 662, 124 S. W. 888; De Garmo v. Vogt, 151 Ky. 847, 152 S. W. 969.

It is a rule of universal application as recognized in the foregoing authorities from this jurisdiction that it is the duty of a municipality when there is an obstruction, a pitfall, or other dangerous condition in the street, to adopt such means as are reasonably necessary to warn persons using the street of the danger, and generally speaking, it is left for a jury to determine, in the particular circumstances in each case, whether the means used for this purpose were reasonably sufficient.

"In some instances guard rails might be amply sufficient, in others lights, in still others additional means might be required. No hard and fast rule can be laid down fixing the means that shall be employed in each particular case further than to say that they will be sufficient to warn the traveling public of the obstruc-

tion." McQuillin on Municipal Corporations, sec. 2993; also cases above cited.

In Chance v. City of St. Joseph, 195 Mo. App. 1, 190 S. W. 24, 26, it appears that a street of the City of St. Joseph ended abruptly at a precipitous bank. In using the street Chance drove over the embankment. He recovered on the theory that the city was negligent in not maintaining a barricade sufficient to prevent travelers from driving over the embankment, and on appeal the judgment was affirmed. After citing Wiggins v. St. Louis, 135 Mo. 558, 37 S. W. 528, where it was held negligence for the city to leave an excavation adjacent to the street and which rendered travel on it dangerous and it was as much the duty of the city to protect the public against such dangers as it would have been if the excavation had been in the street, the opinion continuing said:

"Even more apparent and certain is the duty of maintaining a barrier across a public street, where it abruptly ends at the very edge of a precipice."

In Johnson v. State, 186 App. Div. 389, 173 N. Y. S. 701, affirmed 277 N. Y. 610, 125 N. E. 919, an automobile left the highway and went over a retaining wall 57 feet away, and Johnson, an occupant of the automobile, was killed. His administratrix recovered judgment against the state and on appeal the judgment was affirmed. Johnson and his companions were traveling along in the nighttime when it was very dark and foggy and they could only see about 10 feet ahead of the car by the headlights. There was a very sharp curve to the left in the highway where a blacksmith shop stood on the right hand side of the highway. An open space in front of the shop had been filled in to approximately the level of the highway, and this space presented the appearance in the night of being a continuation of the highway. It was held in effect that because of the unusual conditions which tended to mislead and deceive persons traveling in the direction Johnson and his companions were, into the mistaken belief that instead of the highway curving to the left at a sharp angle it continued directly ahead, it was the duty of the state to maintain sufficient guards.

In the case of Lendrum v. Village of Cobleskill, 192 App. Div. 828, 183 N. Y. S. 215, 219, it was held that

the municipality was negligent in failing to place sufficient barriers and warning signs at a place in the highway where the lights at an embankment and curve therein created the illusion that the road continued straight ahead instead of curving sharply. After referring to a case from that jurisdiction in which it was held in effect that where there were dangers in such close proximity to a highway as to make traffic on it perilous or where there are unusual and exceptional conditions, proper and necessary safe guards should be taken to protect the traveling public, it was said:

"In the present case danger was close to the street; unusual and exceptional conditions prevailed, viz.: The curve was sharp, turning to the right near the edge of the embankment, 19 feet from the place where the accident occurred; the road was circular in formation at this point, and from 2 to 3 feet higher than the edge where the plaintiff went over; the peculiar color or haze caused by the rays descending from the electric light suspended from a pole 16 feet away and the same comingled with plaintiff's lights; the delusion arising therefrom, natural and perfect, that the road went straight ahead; the electric light on the opposite bank of the gulley; the descent was such that, notwithstanding the application of brakes, it caused the car to slide over; the absence of any warning sign to tell approaching travelers that danger was ahead—that the curve and embankment was there to be avoided. * * * I cannot escape the conclusion that the defendant in this case is liable."

See, also, Boyd v. Kansas City, 291 Mo. 622, 237 S. W. 1001; Schorr v. Eastern Engineering Co., 155 A. 790, 9 N. J. Misc. 786; Marek v. City of Alpena, 528 Mich. 637, 242 N. W. 793. A number of cases of similar trend as the foregoing might be cited, but we deem these sufficient.

Although courts in some jurisdictions hold to a contrary view, this court is committed to the theory that the law does not impose upon municipalities the obligation to erect rails or barriers sufficiently strong to keep an automobile from going over an embankment, etc., in or near the highway. See Watkins' Administrator v. City of Catlettsburg, 243 Ky. 197, 47 S. W. (2d) 1032; City of Catlettsburg v. Sutherland's Adm'r.

247 Ky. 540, 57 S. W. (2d) 512. Also McQuillin on Municipal Corporations, sec. 2993; Bond v. Billerica, 235 Mass. 119, 126 N. E. 281.

But as will be seen from authorities hereinbefore cited, our court, in keeping with the general trend of authority, does recognize the duty of a municipality to exercise ordinary care in adopting such means as may be necessary to warn ordinarily prudent travelers of obstructions or pitfalls or extraordinary or unusual conditions which may render travel on a street dangerous. Equally universal is the rule that persons using streets or other highways must exercise ordinary care for their own safety, but they have a right to assume, in the absence of notice to the contrary, that streets are reasonably safe for public travel, and ordinary care does not impose upon them the duty to be constantly on the alert or peering into the darkness to discover dangers in their path to which attention has not been called or which could not be discovered by ordinary care. Bickel Asphalt Paving Co. v. Yeager, 176 Ky. 712, 197 S. W. 417; McQuillin on Municipal Corporations, sec. 3012, and cases therein cited.

There is much evidence that this was an unusual and exceptional condition—a sharp curve on a steep grade in a bridge 35 or 40 feet high. As shown, it was recognized as exceptionally dangerous by some who had used it, and especially so when it was 'dark and rainy. According to the evidence for appellees, the guard railing could not be easily discerned by the lights of an automobile and the light on the pole near the bridge did not reveal the curve or railing but only added to the confusing and illusory effect. There is evidence that some time before the accident a warning sign had been maintained above the railing but none was there at the time of the accident. While, as already indicated, a municipality would not be required to maintain a sufficient barrier to restrain motor vehicles, it would be required to give warning of the dangerous situation, and apart from the question of the strength of the barrier, the petition otherwise charged actionable negligence, had the action been against the city. By contract with the city, appellants not only assumed the obligation of erecting the bridge, but also the continuing obligation to keep it in good order and safe condition. Taking into account the allegations with respect to the

consideration, which are not denied, and the terms of the contract which are plain and unambiguous, it is apparent that appellants meant to and did assume the duties and responsibilities that otherwise would have devolved upon the city; and such holding is in harmony with the trend of authority where either by agreement or by statute, a railroad company or other corporation or person is obligated to keep a bridge safe for travel.

In Norfolk & Western Ry. Co. v. James, 147 Va. 178, 136 S. E. 660, 661, it appears that the company in double-tracking its road from Norfolk to Roanoke found it necessary to alter grades and to change the location of its line and of county road crossings. It secured "permission to make, where necessary, such changes as will enable the said railway company to make such crossings as safe as possible to persons traveling in the county roads." For some distance from the overhead crossing the highway ran parallel with and about 25 feet from the cut in which the tracks were located, and then made a "nearly right angle curve" to and approached the bridge at an elevation. Mr. James accompanied by his family and a friend was driving his automobile about 10 miles per hour in darkness and fog which so obscured his vision that he failed to complete the curve, missed the bride a few inches, and went over the unguarded embankment into the 35-foot cut injuring all the occupants of the automobile. It was held in effect that the railway company was negligent in building the bridge narrower than the roadway and leaving a deep chasm on each side without giving warning of its existence, and without a fence, guard rail, or other obstruction to prevent travelers exercising ordinary care from leaving the road and running over the embankment. To the same effect, see Virginian R. Co. v. Farr, 147 Va. 217, 136 S. E. 668; Strange v. Budcaw Lumber Co., (7) Ark. 490, 96 S. W. 152, 116 Am. St. Rep. 92; Baltimore & O. Ry. Co. v. Boteler, 38 Md. 568; Abbott v. Board of Com'rs of Wyandotte County, 94 Kan. 553, 146 P. 998.

From the record as a whole, we are constrained to the view that appellants obligated themselves not only to keep the bridge in good repair but to keep it safe for travel, and this included such reasonable measures as were necessary to warn ordinarily prudent persons of

any unusual, exceptional, dangerous conditions. Less exaction would be putting economy in expenditure and slight inconvenience in complying with these humane requirements above the life and safety of persons using public thoroughfares in a prudent manner. As between the contracting parties, appellants stepped into the place of the city; but whether as to third parties they might be jointly or severally liable, we need not determine since the city is not a party to any of the actions. It follows therefore, as we conclude, that the court did not err in overruling the demurrers to the petitions. It is likewise apparent from what we have already said that the evidence was sufficient to take the case to the jury.

Instruction No. 1 given by the court imposed upon appellants the duty of maintaining on the bridge a guard rail around the curve of reasonably sufficient strength and dimension to prevent motor vehicles from running off the bridge. In this particular, as is clearly manifest from what we have already said, the instruction was erroneous. Since in the event of another trial there may be a reformation of the pleadings and the evidence may be materially different, we refrain from an attempt to state the character and form of the instructions that should be given except to say that instruction No. 1 should define the duty of the respective parties as herein indicated.

Due to the fact that the judgment must be reversed on other grounds, it will be unnecessary for us to determine the controversy as to whether appellants offered an instruction on contributory negligence which was refused by the court; however, we deem it proper to say that under the evidence contributory negligence instructions were authorized. Evidence of witnesses and the physical facts testified to tend to indicate that the automobile was being driven at a high rate of speed. Ordinarily the negligence of an owner who is driving the automobile is not imputable to a mere guest [White v. McClintock-Field Co., 242 Ky. 688, 47 S. W. (2d) 527; Lexington Ice Co. v. Williams' Adm'r, 236 Ky. 318, 33 S. W. (2d) 14] and will not preclude the guest recovering against another unless the driver's negligence was the sole cause of the injury [Consolidated Coach Corporation v. Hopkins' Adm'r, 238 Ky. 136, 37 S. W. (2d) 1; Wallis v. Illinois C. Ry. Co., 247 Ky. 70, 56 S. W.

(2d) 715]; yet the law does impose upon the guest the duty of exercising ordinary care for his own safety. He cannot sit idly by and ignore obvious dangers without protest or warning to the driver and then in the event of accident hold the driver or others liable in damages. See Stephenson's Adm'x v. Sharp's Ex'rs et al., 222 Ky. 496, 1 S. W. (2d) 957, and cases therein cited. In offering instruction No. 1 which was given by the court, appellees in defining their own duties apparently recognized that instructions on contributory negligence were authorized.

Counsel for appellants further argue that the court erred in refusing instruction C offered by them, but everything therein contained would be embodied in instruction No. 1 in correct form and in correct instructions on contributory negligence.

For the reasons indicated the judgment in each of the cases is reversed, and the causes remanded for a new trial and for proceedings consistent with this opinion.

Whole Court sitting.